### WOODFORD v. RICE et al.

#### (District Court, E. D. Oklahoma. August 11, 1913.)

**1. BANKRUPTCY (§ 303*) — FRAUDULENT TRANSFERS — ACTIONS — BURDEN OF PROOF.**

The wife of a bankrupt, who purchased his stock of goods at the trustee's sale, purchased other goods, and transferred them to a corporation organized by her to carry on the business formerly carried on by the bankrupt, had the burden of showing, in a suit by the trustee, that such purchases were made out of funds derived from her own estate and not from money furnished her by the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

**2. BANKRUPTCY (§ 303*)—FRAUDULENT TRANSFERS—ACTIONS—SUFFICIENCY OF EVIDENCE.**

In an action by a trustee in bankruptcy against the bankrupt's wife and others to recover goods purchased by the wife and transferred to a corporation organized by her to carry on the business formerly carried on by the bankrupt, evidence *held* to show that the wife purchased such goods with money furnished her by the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

**3. BANKRUPTCY (§ 303*) — FRAUDULENT TRANSFERS — ACTIONS — BURDEN OF PROOF.**

Where the wife of a bankrupt purchased his stock of goods at the trustee's sale and purchased other goods, transferred the goods to a corporation organized by her to carry on the business formerly carried on by the bankrupt, and transferred part of the corporate stock to other parties, the trustee in bankruptcy, in a suit to recover the goods on the theory that they were purchased with money furnished by the bankrupt, had the burden of proving the allegations of his complaint by a preponderance of the evidence as against the corporation and the defendants other than the wife of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

**4. BANKRUPTCY (§ 303*)—FRAUDULENT TRANSFERS—ACTIONS—SUFFICIENCY OF EVIDENCE.**

In an action by a trustee in bankruptcy to recover goods purchased by the bankrupt's wife and transferred to her by a corporation organized for the purpose of carrying on the business formerly carried on by the bankrupt, evidence *held* to show that the other stockholders in the corporation did not purchase the stock in good faith or pay therefor but that they were simply assisting the bankrupt to cover up his property.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

**5. BANKRUPTCY (§ 305*)—FRAUDULENT TRANSFERS—ACTIONS—RELIEF.**

The wife of a bankrupt, with money furnished her by the bankrupt, purchased his stock of goods at the trustee's sale and transferred them, with other goods bought by her, to a corporation organized by her to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

carry on the business formerly carried on by the bankrupt, paying for certain of the goods so purchased with stock in the corporation. The trustee then brought suit to recover such property on the theory that it represented a fraudulent transfer by the bankrupt. *Held* that, before any of such property could be taken for the benefit of the bankrupt's creditors, the obligations of the corporation for property purchased by it should first be paid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 466–468; Dec. Dig. § 305.*]

In Equity. Suit by J. W. Woodford, as trustee in bankruptcy of Benjamin Rice, against Rose Rice and others, in which defendant C. L. Stange filed an intervening petition. Decree for complainant against all of the defendants except Stange, whose intervention is allowed.

Aby & Tucker, of Tulsa, Okl., for plaintiff.

Davidson & Williams, of Tulsa, Okl., for defendants Rose Rice, Jacob Romm, Elias Romm, Abraham Shapiro, and 4 Winners Co.

Morris G. Levinson, of St. Louis, Mo., for defendant C. L. Stange.

YOUMANS, District Judge. This is a suit in equity by plaintiff, as trustee in bankruptcy of the estate of Benjamin Rice, bankrupt, against Rose Rice, Jacob Romm, Elias Romm, Abraham Shapiro, William H. Crowley, C. L. Stange, and 4 Winners Company, a corporation, to recover for the bankrupt estate a stock of goods held by the 4 Winners Company. A receiver was appointed and the property is now in his charge.

The admitted facts are that Benjamin Rice in the early part of January, 1911, was the owner of and carrying on a mercantile business in Tulsa, Okl. He had been in business at that place for three or four years prior thereto. His stock consisted of jewelry and clothing. He was adjudicated a bankrupt on the 13th of February, 1912. The stock of goods was sold by order of the referee in bankruptcy on the 29th of February, 1912, and J. H. Wimer became the purchaser for $10,410. The purchase was made for Mrs. Rose Rice, the wife of the bankrupt. She caused the money with which the purchase was made to be placed to the credit of Wimer in a bank at Vinita, Okl. Rice was married to Rose Romm on the 1st of January, 1911, at Yonkers, N. Y. A day or two before her marriage Rose Romm conveyed to Benjamin Rice certain real estate. A day or two after her marriage she conveyed to him all the remainder of her real estate except one piece which she conveyed to her father, Jacob Romm. After their marriage Benjamin Rice and his wife came to Tulsa. Up to that time Rice carried nothing in his stock except jewelry. In May, 1911, he put in a stock of clothing also. The stock invoiced at the time of the bankruptcy sale about $27,000. The mercantile debts amounted to $38,000 or $40,000. After the sale Wimer, defendant Crowley, and one Briscoe, on the 8th of March, 1911, organized a corporation, calling it the 4 Winners Company, with an authorized capital stock of $20,000. The stock of goods was transferred to the corporation. All of the stock of the corporation was transferred to Mrs. Rice, and the

certificates were delivered to her husband for her. Rice and his wife went to New York immediately after the organization of the corporation. On the 12th of March, 1912, at Yonkers, N. Y., she transferred 148 shares to Abraham Shapiro, 147 shares to Jacob Romm, and 120 shares to her brother, Elias Romm, and retained the remaining shares herself. A stockholders' meeting was held and a board of directors elected. Jacob Romm was elected president and Elias Romm was made manager of the store at Tulsa. Benjamin Rice and Elias Romm, after having bought a bill of clothing, returned to Tulsa and opened the store at that place on the 15th of March, 1912. They carried on business until the 4th of April, 1912, when the store was taken possession of by the receiver. The allegations of the bill upon the controverted facts are as follows:

"Upon information and belief plaintiff states: That the said Rose Rice obtained the money, supplied by her to the said J. H. Wimer for the purchase of said stock, from the bankrupt, Benjamin Rice, by transfers to her of sums of money by the said Benjamin Rice during the months of December, 1911, and January, 1912, prior to the filing of petition in bankruptcy herein, and within four months prior to the filing of said petition. That said transfers of money were made from time to time from the receipts of the sale of merchandise belonging to the business of said bankrupt, and said money was transferred to the said Rose Rice by the said bankrupt with intent to hinder, delay, and defraud his creditors, the said Benjamin Rice being at the time of said transfers insolvent; that is to say, the aggregate of the property of the said Benjamin Rice, exclusive of the property having been conveyed and transferred with intent to hinder, delay, and defraud his creditors, was not, at a fair valuation, sufficient in amount to pay his debts. That the sums of money so transferred during the months of December and January aforesaid, the exact dates of which transfers are unknown to this plaintiff, amounted in the aggregate to the sum of $14,390, for which said transfers of money said bankrupt received no consideration, and of which said sum the said Rose Rice furnished to J. H. Wimer the sum of $10,410 for the purchase of the said stock of merchandise, formerly the property of Benjamin Rice, and sold by plaintiff as aforesaid, and the remaining $3,980 of such money was, after payment of $500 to J. H. Wimer, forwarded to defendant Abraham Shapiro at Yonkers, N. Y., to be held by him for the said Rose Rice and Benjamin Rice and in due time delivered to them. * * * Plaintiff states: That the corporation, the 4 Winners Company, was organized by and on behalf of the said Rose Rice, Jacob Romm, Elias Romm, Abraham Shapiro, and C. L. Stange, and the said stock of merchandise of Benjamin Rice was purchased and transferred to said corporation in furtherance of the conspiracy to hinder, delay, and defraud the creditors of the said Benjamin Rice; and the said stock of merchandise purchased with the moneys held as aforesaid was the only property or thing of value exchanged by any of the stockholders for the issued capital stock of the 4 Winners Company. That the stock of merchandise held by the 4 Winners Company and purchased through the agencies aforesaid is, by reason of its purchase with the money properly belonging to the estate in bankruptcy of the said Benjamin Rice and to the plaintiff as trustee thereof, rightfully the property of the plaintiff."

These allegations are specifically denied in separate answers by Rose Rice, Jacob Romm, Elias Romm, Abraham Shapiro, and the 4 Winners Company. Defendant Crowley does not answer. Defendant Stange filed answer and intervening petition. He denies any connection with the alleged conspiracy and alleges that he sold and delivered to the 4 Winners Company, merchandise consisting of jewelry of the value of $3,008.11, and that to secure the payment of this amount there was delivered to him a certificate of 136 shares of stock

in the corporation. He prays that, in the event the receiver is ordered to sell the stock of goods, he be required to pay the above amount.

[1] By reason of being the wife of the bankrupt, whose stock of goods she purchased, Rose Rice stands in a relation to the case different from that of the other defendants.

"Purchases of either real or personal property made by the wife of an insolvent debtor during coverture are justly regarded with suspicion, unless it clearly appears that the consideration was paid out of her separate estate. Such is the community of interest between husband and wife; such purchases are so often made the cover for the debtor's property, are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny. In a contention between the creditors of the husband and the wife there is, and there should be, a presumption against her which she must overcome by affirmative proof. Such has always been the rule of the common law, and the rule continued, though statutes have modified the doctrine that gave to the husband absolutely the personal property of the wife in possession, and the right to reduce into his possession and ownership all her choses in action. Authorities to this effect are very numerous." Seitz v. Mitchell, 94 U. S. 580, 24 L. Ed. 179.

To the same effect are the following cases: Hershy v. Latham, 46 Ark. 542; Core v. Cunningham, 27 W. Va. 206; Heiges v. Pifer, 224 Pa. 628, 73 Atl. 950; Wimberly v. Montgomery Fertilizer Co., 132 Ala. 115, 31 South. 524; Kahn v. Weinlander, 39 Fla. 217, 22 South. 653; Levi v. Rothschild, 69 Md. 349, 14 Atl. 535; Yates v. Law, 86 Va. 117, 9 S. E. 508.

The rule of law thus enunciated, applied to the pleadings in this case, places the burden of proof on Mrs. Rice to show that the purchase of the stock of goods was made by her with means derived from her own estate.

[2] Her story is in substance as follows: She came when a child with her father and mother from Russia to New York City. She began to work when quite young, and learned English by attending night school. In the course of time she became an expert as a shirt waist designer and saved some money. She then went into business for herself. She first had a partner by the name of Smith. That firm went out of business, and in the division of the assets she received $4,000. She then formed a partnership with one Kayton, using her father's name instead of her own. She afterwards bought Kayton out and continued the business herself under the name of Romm & Co. until she was burned out in 1909. She collected from the insurance companies about $7,000, and the salvage amounted to about $1,000 more. She had outstanding at the time of the fire $7,000 to $9,000 that she afterwards collected. She kept a bank account and deposited the receipts from her sales from day to day. When she bought the interest of her partner she adopted the plan of allowing herself $100 a week, which amount she included in the check drawn on Saturday to cover the week's expenses. This amount, less her personal expenses, which were small, she kept in her safe until she had accumulated $5,000. This amount, inclosed in sealed envelopes, she delivered to her brother-in-law, to be by him placed in his box in a safety deposit vault. This was in 1908. The sum thus deposited was added to

from time to time until, at the time of her marriage on the 1st of January, 1911, it reached an amount between $14,000 and $15,000. She made investments in real estate to the amount of $12,000 or $14,-000, but the sum in the safety deposit vault was never drawn upon. She was 25 or 26 years of age at the time of her marriage. She conveyed all of her real estate to her husband, except one piece, and afterwards delivered to him the proceeds of the sale of that. She never told her husband of the money in the safety deposit vault until after her purchase of the bankrupt stock, on the 29th of February, 1912. After her marriage she carried this money on her person, first to Hot Springs, Ark., and then to Tulsa, Okl. On account of a burglary in her house at Tulsa in January, 1911, she considered it unsafe to keep the money in the house, and she asked her husband to secure for her a safety deposit box. He told her that he had such a box in the Central National Bank of Tulsa, and that she might have it. She kept this money in that box until December, 1911. On the 4th or 5th of December, on account of the neglect of her husband, she determined to leave him and go back to New York, and with that purpose in view she took the money out of the vault. When she charged her husband with neglect, he explained his conduct by telling her that he had been robbed of diamonds of the value of $18,000 or $19,000, and that on account of such robbery he was insolvent. After the institution of bankruptcy proceedings she determined, without communicating her purpose to her husband, to buy the stock at bankrupt sale. She consulted with Mr. Orr, cashier of the Colonial Trust Company, of Tulsa, and requested him to issue cashier's checks in the name of some one else besides herself and cause them to be indorsed by the payee and delivered to her. This was done and cashier's checks to the amount of $14,500 then came into her hands, for which she paid out of the money which she had taken from the vault. Mr. Orr also procured Mr. Wimer, of Vinita, Okl., to bid for the stock of goods at the sale in his own name. For that purpose the cashier's checks above referred to were placed to his credit in the bank at Vinita. Wimer bought the stock for $10,410, and paid for it out of the amount placed to his credit, and the balance was returned to Mrs. Rice. This was not made known to her husband until March 1, 1912. After the purchase, Wimer, Crowley, and Briscoe organized a corporation at Vinita and called it the 4 Winners Company. The capital stock was $20,000. The stock of goods purchased by Wimer was transferred to the corporation. All the stock of the corporation was transferred to Mrs. Rice, and she and her husband went at once to New York. On the 12th of March, 1912, she paid to Abraham Shapiro $2,332.40 for furniture bought by her just prior to her marriage. On the same day Shapiro bought from her 148 shares of the stock of the 4 Winners Company, for which he paid her $2,300 in cash and gave her a note for $975 payable in nine months. She also sold her father 147 shares and took his note for $3,675. She sold her brother Elias Romm 120 shares for $3,000 cash. The meeting of the stockholders was held on the 12th of March, 1911. The board of directors elected Jacob Romm as president, and Elias Romm was elected secretary and manager. Rice was employed at a salary of $25 a week. The proceeds of sales, less ex-

penses, were to be sent to the president to be turned over to Mrs. Rice until she had received $8,000 or $9,000. Under this arrangement $4,-500 were sent to her prior to the appointment of the receiver.

In all things pertaining to the management of her business and the purchase of real estate, Mrs. Rice is fully corroborated. With regard to placing the money in the bank vault, she is corroborated by her brother-in-law to the extent that he placed in the box for her envelopes which she said contained money. He saw no money in such envelopes. She is further corroborated by her husband to the extent that he turned over to her a key for a safety deposit box in the Central National Bank, of Tulsa. He placed nothing in the bank and knew nothing of her having this sum of money. With these two exceptions, Mrs. Rice's story stands uncorroborated. She possesses energy, aggressive-ness, and business ability. She deposited regularly in the bank and drew checks for what she expended. Her balance ran from $1,000 to $5,000. Why she should accumulate a large amount and not deposit it in bank is explained by her statement that, on account of the panic of 1907, she distrusted the banks. If she were unaccustomed to banks, such a course might not be considered strange. Her acquisitive faculty was highly developed. She was a money maker. No explanation is given why she kept so large an amount of money in a vault where it was earning nothing. Her confidence in her husband that led her to convey to him all of her real estate contrasts strangely with her distrust of him in not only refraining from turning over to him this large sum of money, but also in keeping from him the knowledge that she possessed it. In July, 1911, her husband executed to her notes for the value of all the real estate conveyed by her to him. At the time of the conveyance to him, nothing was said about the payment to her for the property. In consideration of $1,550 collected by her, he assigned to her his lease on the house in which he was doing business. From her testimony the inference is that all the cashier's checks were purchased by her at one time. She also testified that the amount of the cashier's checks was $14,500. She did not purchase all the checks at one time, and the amount exceeded the sum stated by her. The testimony of the cashier showed that the dates of issuance and the amounts were as follows

| | |
|---|---:|
| December 5, 1911 | $ 3,900 00 |
| December 7, 1911 | 2,100 00 |
| December 8, 1911 | 2,490 00 |
| December 11, 1911 | 990 00 |
| December 12, 1911 | 1,110 00 |
| December 13, 1911 | 1,000 00 |
| December 15, 1911 | 600 00 |
| December 16, 1911 | 500 00 |
| December 18, 1911 | 2,000 00 |
| December 22, 1911 | 1,700 00 |
| December 26, 1911 | 1,600 00 |
| Total | $17,990 00 |

This amount exceeds the amount stated by her, $3,490. She does not undertake to explain this discrepancy in her testimony. Her testimony that she had not told her husband that she had this sum of

money in her possession and that she intended to buy the stock is contradicted by the fact that Orr sent Rice to Wimer with a letter of introduction. The letter is as follows:

"February 28th, 1912.

"Mr. J. H. Wimer, Vinita, Oklahoma—Dear Jim: This will introduce to you Mr. Ben Rice, a clothing man here in town who has come down to stay in the store for you to-morrow so that you can come down here. Please come down on the first train in the morning, or to-night if you can, as I would like to talk to you and would rather that you come down to-night. Mr. Rice will explain to you something about what I wish you to do here, and you may talk to him just as you would to me. You may call me up after Mr. Rice talks to you this evening and let me know when you can come. If you can catch that 8 o'clock to-night and get here about 10:50 that would be the best. Notify me that you are coming to-night, and call me up anyway."

Rice took Wimer's place in the latter's store while he went to Tulsa to bid in the property for Mrs. Rice. She testified that she paid Wimer $500 for his services. Wimer testified that he received that amount, but states that it was paid to him by the 4 Winners Company. The result is that the testimony of Mrs. Rice with regard to accumulating a large sum of money in a safety deposit vault and keeping its existence hidden from her husband, carrying it on her person to Tulsa, placing it again in the safety vault, buying cashier's checks therewith, and using them in the purchase of the stock of goods, cannot be believed. The manner in which the cashier's checks were issued sustains the allegation that the checks were bought with funds derived from the sale of the bankrupt's goods. Not only has she failed to produce affirmative proof showing that the money with which she purchased the stock of goods belonged to her, but the testimony in the case is sufficient to show that her connection with the transaction was fraudulent and was an effort to withdraw her husband's assets from the reach of his creditors.

[3, 4] With regard to the remaining defendants, the law imposes the burden of proof upon the plaintiff to make out the allegations of his complaint by a preponderance of the evidence. With regard to Shapiro, he and Mrs. Rice testify that she paid him on the 12th day of March, 1912, for furniture bought by her in December, 1910, before her marriage, the sum of $2,332.40. The bill was introduced in evidence and purports to have been made out on the day on which it was paid. The date on which the articles were purchased is not given. Shapiro testified that he did not sell goods on credit; yet, if his story is to be believed, these goods were sold in December, 1910, and were not paid for until March, 1912, during all of which time Mrs. Rice, according to her story, had in her possession nearly $15,000 in cash. Shapiro paid her for stock $2,300 in cash, a few dollars less than the amount she had paid him on the morning of the same day. Shapiro states that he bought the stock upon the statement made to him that the goods invoiced $27,000, and he regarded the stock as worth more than par, yet he was present at a meeting at which it was agreed that Mrs. Rice was to be paid out of the proceeds of the first sales the difference between the par value of the stock in the corporation and the invoice value of the goods. Benjamin Rice and his wife were introduced as witnesses for the plaintiff. Shapiro tes-

tified for himself. The facts surrounding the case warrant the conclusion that the stock was not purchased by Shapiro in good faith; that he actually paid no money for it; that it was not intended that his note should be paid; and that he was simply assisting Rice to cover up his property. The same may be said with regard to Jacob Romm and Elias Romm. The latter claims to have paid Mrs. Rice $3,000 for 120 shares of stock. He testified that a part of that money was carried by him on his person, and that the remainder was in the possession of another sister. He was a chauffeur and said that he sometimes sold automobiles on commission. The facts surrounding the transaction, so far as he is concerned, convince me that his connection with it was not in good faith, and that he, in fact, did not pay anything for the stock transferred to him.

Jacob Romm testified that he gave his note for the purchase price of the stock transferred to him. He further testified that in July following he paid $2,000 on that note. At that time the stock of goods was in the hands of the receiver and this suit was pending. He was a man of small means. He owned two tenement houses. The circumstances surrounding his connection with the transaction convince me that he did not make the purchase of the stock in good faith, and that he did not pay anything on the note. He was simply used by his daughter and son-in-law.

[5] Upon the issue raised by the answer and intervention of Stange, I am convinced from the testimony that Stange sold to the 4 Winners Company the bill of goods referred to in his answer, and that the 4 Winners Company owes him a balance thereon. All of the obligations of the 4 Winners Company should be first paid before any of its property is taken for the benefit of the creditors of Benjamin Rice.

A decree will be entered sustaining the prayer of the complaint as to all of the defendants except Stange, whose intervention will be allowed.